UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| AHMED MATTAR, M.D. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:04-CV-095 |
| | ) | |
| COMMUNITY MEMORIAL | ) | |
| HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the court is Defendant Community Memorial Hospital's ("CMH's") Motion for

Summary Judgment as well as a Motion to Strike certain exhibits filed by Plaintiff, Ahmed Mattar,

M.D. ("Dr. Mattar's"), proceeding *pro se,* as part of his response to CMH's request for summary

judgment.  Both motions are fully briefed and, for the following reasons, CMH's Motion for

Summary Judgment will be GRANTED.  The Motion to Strike will be DENIED as MOOT.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if there are no disputed genuine issues of material

fact.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  When ruling on a motion for summary

judgment, a court "may not make credibility determinations, weigh the evidence, or decide which

inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a

motion for summary judgment is "to decide, based on the evidence of record, whether there is any

material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th

Cir. 1994).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the

nonmoving party, summary judgment may not be granted.  *Payne*, 337 F.3d at 770.  A court must

1

construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

Mindful of these standards, the court turns now to an examination of the factual record.

## FACTUAL BACKGROUND

### I. The Parties

CMH is a licensed health care facility located in Hicksville, Ohio. CMH also owns and operates a medical office in Harlan, Indiana, commonly known as the Harlan Family Health Center (the "HFHC"). The HFHC provides health care services to individuals.

Dr. Mattar is a general family practice physician formerly employed by CMH. Dr. Mattar has dual Egyptian and Canadian citizenship and is a member of the Islamic faith.

At all relevant times related to this lawsuit, Michelle Waggoner ("Waggoner") was employed by CMH as CMH's Compliance Officer. Presently, and since June 2004, Waggoner holds the position of CMH's Chief Operating Officer and Compliance Officer. Olas Hubbs, III was CMH's Chief Executive Office during all relevant times related to this lawsuit.

### II. Dr. Mattar's Employment Agreement with CMH

In 1994, Dr. Mattar became employed with CMH. During the course of his employment, Dr. Mattar and CMH entered into several employment agreements. On May 17, 2001, CMH and Dr. Mattar entered a five year Physican Employment Agreement ("the Employment Agreement") wherein Dr. Mattar became the HFHC's sole primary care physician. The Employment Agreement

2

provided that, in exchange for his salary, all fees for professional services rendered by Dr. Mattar

belonged to CMH and that CMH was responsible for determining the amount of professional fees

charged by Dr. Mattar.  In addition, the Employment Agreement required Dr. Mattar to observe and

comply with all of CMH's policies and procedures, including but not limited to, CMH's Anti-

Kickback policy, set forth below:

> Employees or representatives of [CMH] are not permitted to knowingly and willfully
> offer, pay, ask, or receive any money or other benefit, directly or indirectly in return
> for obtaining or rewarding favorable treatment in connection with the award of a
> government contract or the referral of patients...
>
> Patient deductibles and co-payments for physicians may not be waived without prior
> authorization of the Compliance Office.

(Hubbs Aff. ¶S5, 15, Exh. A §3.2(d), §24 and D).  Section 5.3 of the Employment Agreement states:

> Physician shall comply with those provisions of the law which affect [CMH's] and
> Physician's reimbursement for professional and hospital services.  Physician shall
> do nothing which will adversely affect such reimbursement or [CMH's] Medicare
> provider status.   Because Physician provides charting services to support
> reimbursement of [CMH] claims, Physician agrees to document services rendered
> in a lawful, complete and adequate fashion so as to support proper coding of claims.

(*Id.* at ¶5, Exh. A).

CMH also has a corporate policy governing Organizational Ethics which requires all

employees, including Dr. Mattar, to comply with state and federal laws.  The policy further requires

employees to refuse to participate in or conceal illegal or unethical acts of others.  (*Id.* at ¶15, Exh.

E.)

During his employment, Dr. Mattar received regular compliance training regarding fraud

and abuse issues as well as CMH's policies, and state and federal laws.  (Waggoner Aff. ¶5).

### III. Dr. Mattar's Performance

In October 2002, CMH hired Prescribe Medical Management ("Prescribe"), a consulting

3

firm, to assist CMH in the management of its physician practices, including Dr. Mattar's practice. Melissa Doepke ("Doepke") is Prescribe's Vice President of Consulting Services and worked on CMH's accounts.

In mid-May 2003, CMH identified several accounts ready to be turned over to collections, including one of Dr. Mattar's accounts (hereafter, "Patient A").[1]  On May 27, 2003, Dr. Mattar called Doepke to discuss Patient A's account. According to Doepke, Dr. Mattar stated that he had agreed with Patient A's family to accept only the amount paid by Patient A's insurance as payment in full for his services.  Any remaining balance not covered by insurance would not be billed to Patient A.  Doepke further recalls that Dr. Mattar indicated that someone in Patient A's family was influential in the community and had referred patients to Dr. Mattar in exchange for not having to pay balances not covered by insurance.

During this conversation, Doepke became concerned about Dr. Mattar's statements and the legal implications of his actions.  Thus, on the same day, Doepke contacted Waggoner and Hubbs and relayed the above conversation with Dr. Mattar to them.  She further indicated to Hubbs that during her conversation with Dr. Mattar, he had stated that he was aware of the legal issues involved with his actions and chose not to document his agreement with Patient A.  After speaking with Hubbs, Doepke documented her conversation with Dr. Mattar in a memorandum which she subsequently forwarded to both Dr. Mattar and Hubbs.  Hubbs, in turn, authored a letter to Dr. Mattar indicating that he was conducting an investigation of Dr. Mattar's actions and outlining the hospital's policy regarding billing.  (Pltf's Exh. 3).

--------

[1]Patient A, it is represented to the Court, is either an Iraqi citizen or an American citizen of Iraqi heritage, and was of the Islamic faith.

On June 3, 2003, after receiving Doepke's memorandum, Dr. Mattar called Doepke to discuss the situation. The following day, Dr. Mattar wrote Doepke to clarify what he perceived were "inaccuracies" in her memorandum. Dr. Mattar also provided Hubbs with a copy of this correspondence and made handwritten notations at the bottom. In this correspondence, Dr. Mattar denies the allegations that he was not charging patient A in accordance with CMH's policies or that he had made an agreement not to charge Patient A because of referrals he was receiving from Patient A's family members.

On June 10, 2003, while the investigation of Dr. Mattar's billing practices was ongoing, Waggoner learned that Dr. Mattar was directing unqualified nurses to take x-rays of his patients in violation of CMH policy and state law. Waggoner alerted Hubbs about her discovery. Dr. Mattar admits that the Center's nurses, none of whom are qualified x-ray technicians, always took the x-rays at his request. However, he contends that this was the way it was always done and he was never informed prior to his termination that this was improper procedure. However, from 2000 to 2003, Dr. Mattar executed the Radiation Machine Registration Application annually submitted to the Indiana State Department of Health ("ISDH") as the "Responsible Individual" for HFHC. The applications identified Dr. Mattar as the only qualified staff member and the only person taking radiographs at HFHC when, in fact, this was not true. Dr. Mattar admits signing these annual certifications but again, states that he was unaware that his actions were improper.

Upon further review, Waggoner discovered that although Dr. Mattar did not perform the x-rays on his patients, he submitted claims to Medicare, Medicaid and private insurers under his personal identification number for services he did not render. CMH's policy governing the submission of claims for payment expressly states :

Under no circumstances should a [CMH] employee knowingly or willfully make or cause a false claim to be made. This includes but is not limited to:

a.      Claiming reimbursement for services that have not been rendered

***

e.      Falsely indicating that a particular health care professional attended a procedure or that services were otherwise rendered in a manner they were not.

Hubbs Aff. at ¶15.

After learning that Dr. Mattar directed unqualified nurses to perform x-rays on his patients in combination with the investigation as to the alleged violation of CMH payment policies, Hubbs decided to terminate Dr. Mattar for violation of CMH policies. The Employment Agreement provided that CMH could immediately terminate Dr. Mattar's employment "upon Physician's breach of [CMH's] Policies and Procedures, particularly related to its Business Practices, as determined within the sole discretion of [CMH]." (*Id.* at ¶5, Exh. A §10). Believing Dr. Mattar to be in violation of various policies, on June 11, 2003, CMH, through Hubbs, terminated Dr. Mattar for (1) waiving patient co-payments and/or deductibles in violation of CMH's policy and federal law; and (2) directing licensed nursing staff to perform duties outside their scope of practice in performing radiological studies in violation of CMH's policy, federal and state law. (Hubbs Aff. ar ¶17; Pltf's Exh. 2).[2]

### IV. Allegations of Discrimination

In his deposition, Dr. Mattar indicated that he believed his religious beliefs, political views,

---

[2]      Since Dr. Mattar's termination, CMH has discovered in excess of 400 improper claims that were submitted to Medicare, Medicaid, and private payors under Dr. Mattar's personal identification number for services not rendered by Dr. Mattar. CMH has had to contact the appropriate agencies to make necessary repayments in amounts totaling approximately $25,000. Further, as a result of Dr. Mattar's actions, CMH suspended each nurse that acted outside the scope of their practice for a period of 3 to 7 days without pay and, each of the nurses has been placed on probation for a period ranging from 6 to 12 months during which time they must obtain certain education requirements.

6

and national origin were factors in his termination.  Dr. Mattar testified that post September 11, 2001, he believed he was perceived differently by CMH, although he could not point to any specific instances where any member of CMH overtly treated him differently.

As part of his original Employment Agreement, Dr. Mattar was not required to work on Fridays.  He testified that his religion required prayer on Friday and, as a result, he negotiated Fridays off work and that this became more of an issue as time went on.  According to Dr. Mattar, during one discussion with Doepke, "the focal point in our discussions anyway was working the Friday, and how important Friday is, and it's the end of the week and people, you know, want to take care of their children before the weekend, which some of it may be true business wise.  But I made it clear to her that this is important to me, and that's you know, at the end I had to point blank tell her that, you know, I am not going to compromise on that." (Mattar Dep. at p. 52).  Due to CMH's persistence in seeking to have Dr. Mattar available for work on Fridays, on March 6, 2003, Dr. Mattar and CMH signed an Addendum to the Employment Agreement whereby Dr. Mattar agreed to work 3 hours, from 9 am to noon, on no less than 43 Fridays per calendar year. (Pltf's Exh. 5)

No one at CMH made disparaging remarks or said anything insulting to Dr. Mattar regarding his religious or political views, or his national origin at any time during his employment. The only "incident" that Dr. Mattar recounted relating to his national origin was after he authored an article critical to United States foreign policy following sometime in 2002.  A letter from an unnamed individual was mailed to CMH suggesting that Dr. Mattar should be "shipped back to where he came from."  Dr. Mattar believes that this letter and the sentiment in it should have been more strongly refuted by Hubbs.  Dr. Mattar and Hubbs discussed the letter briefly and Hubbs

indicated that he wrote a response to the person indicating that Dr. Mattar has the right to his opinion. There is no evidence suggesting that Hubbs considered this incident at the time he made the decision to terminate Dr. Mattar.[3]

## DISCUSSION

Based upon the above facts, Dr. Mattar filed the instant lawsuit pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981 alleging that his termination occurred not, as CMH suggests, for violating company policies but because he is an Egyptian citizen and a Muslim.

Discrimination claims under Title VII and §1981 are analyzed in the same manner. *Patton v. Indianapolis Public Sch. Bd.,* 276 F.3d 334, 338 (7th Cir. 2002). To survive CMH's motion for summary judgment on his claims, Dr. Mattar need only raise an inference of discrimination. *Fuka v. Thomson Consumer Elec.,* 82 F.3d 1397, 1402 (7th Cir.1996). He may do this by various methods recognized in this circuit.

Under the direct method of proof, there are two types of permissible evidence. First, there is direct evidence, or evidence that, if believed by the trier of fact, would prove the fact in question

---

[3]After his termination, Dr. Mattar disputed his termination and initiated arbitration pursuant to the terms of his Employment Agreement. Hubbs Aff. ¶19. After the arbitrator rendered his award, CMH filed suit in Lucas County, Ohio to vacate the arbitrator's award and enforce the terms of the Employment Agreement. In that lawsuit, Dr. Mattar submitted a brief indicating that it was his belief that "he was discharged because CMH was not making money from Dr. Mattar's department." In addition, Dr. Mattar further indicated in a brief that "CMH's stated basis for nim being discharged, i.e., his violation of CMH's business policy, was only a pretext for the actual reason he was discharged, that being the hospital's desire to cut expenses." (Mattar Dep at pp. 39-40, 42-22). There has been no mention in that lawsuit of the discrimination claims made in the present lawsuit. In addition, Dr. Mattar denies that he has ever stated that the motivation for his termination was monetary.

Nevertheless, Dr. Mattar has submitted as evidence, a CD of the arbitration proceedings and the brief he filed in the arbitration, both of which CMH has moved to strike. Because the court has not relied on this evidence in rendering the present decision, the motion to strike will be DENIED as MOOT.

"without reliance on inference or presumption." *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir.2003) (internal quotation omitted). Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* (internal quotation omitted). Dr. Mattar does not have such evidence and thus, he is left to prove discrimination using either the second or third evidentiary formulations.

The second type of permissible evidence relies more on circumstantial evidence and allows a plaintiff to prevail by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Rhodes v. Illinois Dept. of Transp.,* 359 F.3d 498, 504 (7th Cir.2004) (citing *Troupe v. May Dep't Store Co .,* 20 F.3d 734, 737 (7th Cir.1994)). Finally, there is a third method, the oft-recited *McDonnell-Douglas* standard, which CMH relies on almost exclusively in formulating its defense. Under that method to establish a prima facie case from which a jury may infer discrimination, Dr. Mattar must show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) CMH took an adverse employment action against him and (4) that CMH treated similarly-situated employees outside the protected class more favorably. *Stalter v. Wal-Mart Stores, Inc.,* 195 F.3d 285, 288 (7th Cir.1999).

Under this latter formulation, if Dr. Mattar meets his burden, CMH must articulate a legitimate, nondiscriminatory reason for its actions. *Little,* 369 F.3d at 1011. If CMH were able to point to such a reason, the burden remains with Dr. Mattar to show that the reason put forth was not a true reason, but a pretext--"a dishonest explanation, a lie rather than an oddity or an error." *Peters,* 307 F.3d at 545 (quoting *Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 685 (7th Cir.2000)).

9

In its summary judgment motion, CMH argues that Dr. Mattar has neither the type of direct evidence admissible under *Troupe* and, with respect to the *McDonnell Douglas* approach, CMH challenges the second and fourth prongs of the burden-shifting analysis, i.e., whether Dr. Mattar was meeting her employer's legitimate expectations at the time of his termination and whether similarly situated others were treated more favorably.   Dr. Mattar, in turn, denies all of the allegations concerning his allegedly deficient performance and contends that the reason provided for his termination was pretextual

Beginning first with the *Troupe* analysis, the Seventh Circuit has clarified that the most common type of circumstantial evidence of intentional discrimination is "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736.   Having reviewed the evidence, it is clear that Dr. Mattar has failed, under *Troupe*,  to demonstrate that the decisionmakers were motivated by his national origin or religious beliefs to terminate him.   Indeed, Troupe requires the circumstantial evidence to "point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir.2003).   There is simply no evidence in the record that Hubbs had a discriminatory motivation for taking action against Dr. Mattar rather than some other motive. There is no record of derogatory remarks from Hubbs, the decisionmaker, regarding Dr. Mattar's national origin or religious affiliation and no record of ambiguous statements which by themselves or in collaboration would support a conclusion that national origin or religion was the "real reason" for the action.

In light of this record, Dr, Mattar must  rely on "other bits and pieces" which he claims

raise an inference of discriminatory intent. Unfortunately, Dr. Mattar offers no evidence which

reasonably could be characterized as suggesting national origin or religious discrimination at all

other than the fact that Doepke, a non-decisionmaker, was critical of Dr. Mattar not working on

Fridays. Even this evidence, however, is a non-starter though since Dr. Mattar has produced no

evidence that his failure to work on Fridays was factored into the termination decision made by

Hubbs.

Dr. Mattar also argues that there is "overwhelming evidence" of discrimination because

Patient A, the person he is alleged to have improperly billed, is also Muslim and thus, his

termination was the "target of a deliberate hate campaign just because [Patient A was] as I am,

Arabs and Muslims." According to Dr. Mattar he did nothing improper with Patient A's account.

There is, however, nothing in the record to support this allegation of a "hate campaign" so as to

warrant sending this case to a jury. No statements by anyone at CMH have been presented, no

documentary evidence demonstrating any intent by CMH to "punish" Dr. Mattar for favoritism

toward members of his religious order or toward Arabs. The best evidence Dr. Mattar has is an

unsupported suspicion of discrimination but nothing more. This is simply not enough to survive

summary judgment. *Johnson v. Toledo Bd. of Educ.* 2003 WL 22436127, *4 (N.D.Ohio,2003)

("Plaintiff's unsupported suspicion that discrimination is to blame is insufficient to carry his burden.").

For many of the same reasons, Dr. Mattar's discrimination claims fail under the

McDonnell-Douglas formulation as well. CMH argues that because Dr. Mattar was not

performing satisfactorily at the time of his termination, he cannot meet the second prima facie case

element. On that point, the court is faced with the classic situation wherein an employer's alleged

non-discriminatory reason for terminating the plaintiff is that the employee's performance did not

11

meet the employer's expectations. In cases where this occurs, the legitimate expectations prong

of the prima facie case often merges with the related issue of pretext. *Roberts v. Separators, Inc.,*

172 F.3d 448, 451 (7th Cir.1999) (analysis of employer's legitimate expectations often "dovetails"

with that of pretext).

Here, Dr. Mattar argues that for 9½ years he consistently performed his job without

complaints from anyone at CMH and thus, it is clear that the decision to terminate him was not

based at all on his performance but on discrimination. However, statements by either himself or

others, showing that his job performance for a period of time prior to termination was satisfactory,

are insufficient to create a material issue of fact as to whether a plaintiff was meeting his

employer's legitimate employment expectations at the time he was terminated and whether the

employer's reason for termination was pretextual. *See, e.g., Dey v. Colt Constr. & Dev. Co.,* 28

F.3d 1446, 1460 (7th Cir.1994) ("Our cases ... give little weight to statements by supervisors or

co-workers that generally corroborate a plaintiff's own perception of satisfactory job

performance."). *See also Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1125 (7th Cir.1994);

*Kephart v. Inst. of Gas Tech.,* 630 F.2d 1217, 1218-19, 1223 (7th Cir.1980).

Moreover, even assuming that the allegation of improper billing is false, Dr. Mattar is

required to refute "each and every legitimate, non-discriminatory reason advanced by the Hospital

...to survive summary judgment." *Clay v. Holy Cross Hospital,* 253 F.3d 1000, 1007 (7th Cir. 2001).

*See Adreani v. First Colonial Bankshares Corp.,* 154 F.3d 389, 399 (7th Cir.1998) ("The

existence of a genuine issue of triable fact with respect to some of the reasons for discharge

proffered by the employer is of no consequence as long as at least one reason is uncontested.").

Although he claims, essentially, that he "didn't know better," Dr. Mattar has admitted that he, as

CMH contends, billed private and government insurers for x-rays that were not performed by qualified persons. Simply put, Dr. Mattar has presented no evidence to call into question CMH's reasons for his termination.

Finally, Dr. Mattar spends much time in his brief arguing that CMH's decision was wrong and that he did not violate company policy. But, Dr. Mattar must show more than simply a wrong decision by CMH. Title VII is not violated by a bad decision; it is violated by a discriminatory one. *Bahl v. Royal Indemnity Co.,* 115 F.3d 1283, 1291 ("The inquiry is not whether the reason for the firing was a correct business judgment but whether the decisionmaker honestly acted on that reason."); *Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 410 (7th Cir. 1997) (courts "do not sit as a kind of 'super personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination; we are concerned solely with whether the reasons for which the defendant discharged the plaintiff were discriminatory."). Thus, Dr. Mattar must show that either his national origin or his religious affiliation was *the determining factor* in his discharge, or that but for his national origin or religion, he would not have been discharged. *Dale v. Chi. Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986). To meet this burden, Dr. Mattar must produce "significantly probative admissible evidence" from which the trier of fact could infer that the employer's reason was false *and* that the actual reason was discriminatory. *King v. Preferred Technical Group,* 166 F.3d 887, 892-93 (7th Cir.1999); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). As the court indicated above, Dr. Mattar simply has not produced any "significantly probative evidence" from which a jury could conclude that the actual reason for his termination was national origin or religion. *See U.S. Postal Service Bd. of Govs. v. Aikens,* 460

13

U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) ("The 'factual inquiry' in a Title VII

case is '[whether] the defendant intentionally discriminated against the plaintiff.').

Instead, the facts reveal that CMH honestly believed that Dr. Mattar had violated its

policies. An honest belief is all that is required. *See Little v. Illinois Dept. of Revenue,* 369 F.3d

1007, 1012 (7th Cir. 2004) ("This circuit adheres to the honest-belief rule: even if the business

decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed

the nondiscriminatory reason he gave for the action, pretext does not exist."), see also  *Clay v.*

*Holy Cross Hosp.,* 253 F.3d 1000, 1007 (7th Cir.2001); *Crim v. Board of Educ.,* 147 F.3d 535, 541

(7th Cir.1998); *Bechold v. IGW Sys., Inc.,* 817 F.2d 1282, 1285 (7th Cir.1987).  Accordingly, the

court GRANTS CMH's motion for summary judgment.

## **CONCLUSION**

Based on the foregoing, Defendant's Motion for Summary Judgment is GRANTED.

Defendant's Motion to Strike is DENIED as MOOT.  The clerk shall enter judgment in favor of

the Defendant.

Entered: This 22nd day of February, 2006

s/ William C. Lee
United States District Court
Northern District of Indiana

14